WILLIAMS (HOWE v.). See Case No. 6,778.

WILLIAMS (HURD v.). See Case No. 6,918.

## Case No. 17,723.

### WILLIAMS et al. v. The JENNY LIND.

[Newb. 443.] [1]

District Court, E. D. Louisiana. Nov., 1853.

ADMIRALTY JURISDICTION — INTERIOR RIVERS — SALVAGE CONTRACTS—COMPENSATION.

1. Since the decision of the supreme court of the United States, in the case of The Genesee Chief v. Fitzhugh, 12 How. [53 U. S. 443], the admiralty jurisdiction has been considered as fully established on the Mississippi river, and all other rivers as far as they are navigable from the ocean, for vessels of ten or more tons burden.

2. The establishment of such a jurisdiction, necessarily carries with it all its incidents. Salvage services are as much the subject of admiralty jurisdiction, as damages arising from collisions or other maritime torts.
[Cited in Seven Coal Barges, Case No. 12,677.]

3. The stipulations of a written contract will be recognized no further in a court of admiralty charged with a case of salvage, than they accord with the opinion of the court in the exercise of a sound discretion.
[Cited in Chapman v. The Engines of The Greenpoint, 38 Fed. 672.]

4. This court as a court of admiralty, cannot be called upon to enforce a specific performance of such a contract, though such a contract may and often does form a fair and equitable criterion in fixing the quantum of salvage compensation.
[Cited in The Silver Spray, Case No. 12,857.]

[This was a libel for salvage by Joseph Williams and others against the barge Jenny Lind.]

J. W. Price, for libelants.
Duncan & McConnell, for respondent.

McCALEB, District Judge. This is a claim for salvage compensation for services ren-

---

[1] [Reported by Richard Peters, Jr., Esq.]
[2] [Reported by Hon. William Cranch, Chief Judge.]

[1] [Reported by John S. Newberry, Esq.]

dered on the Mississippi river. It appears that on the 25th of January last, the steamboat Hungarian left the port of Cincinnati bound for the port of New Orleans, having in tow the barge Jenny Lind, laden with a cargo of flour, pork and tallow. On the night of the 6th of February, both the steamboat and barge ran hard aground on Princeton bar, in the Mississippi river. The steamboat remained in that position until the 9th of February, when she got off through the assistance of the steamboat Moses Greenwood, and on the day after, proceeded on her voyage to this port. It does not appear that before leaving, any active exertions were made by her captain to get the barge afloat. The witness Robertson, who was examined under a commission, states that Captain Collier (commanding the Hungarian) took a yawl and went down and examined the condition of the barge and reported that he could do nothing with her. The witness Mass, who was supercargo on the barge, testifies that Captain Collier endeavored to make some arrangements with the Moses Greenwood to relieve the barge. The captain of the Greenwood consented to endeavor to do so, but asked for a delay of two days, to enable him to go up to the mouth of the Arkansas river, and put out his cargo and return. It was the opinion of those persons with whom the witness conversed upon the subject, that the barge would break in two in less than twelve hours. He conversed with the pilots of the Greenwood, and with the captains of both the Hungarian and Greenwood. The Greenwood felt her way out on the bar towards the barge, and the captain concluded that by means of a flat boat between her and the barge, they might pass the cargo out of the latter on to the Greenwood. He would, however, agree to do nothing until he had been up to the mouth of the Arkansas. He thought he might return on the Saturday following, but would make no agreement to be back until Sunday. He refused to leave any of his hands on the barge during his absence. He said he would charge a dollar per barrel for the flour, and fifty cents a hundred for the tallow and pork, on all he might take off and bring to New Orleans. Finding that the Greenwood would do nothing in time, and that some immediate action was necessary to relieve the barge, the captain of the Hungarian proposed to leave the witness in charge of the barge and to proceed with the steamboat on her voyage. To this the witness objected, as he was unwilling to have the whole responsibility on his hands. After a variety of propositions were discussed by the captain and the witness, the latter suggested that Mr. Williams, who is the libelant in this suit, and who was employed as mate on the Hungarian, should take charge of the barge and her cargo, and endeavor to get her off, as he had great confidence in his skill and ability. The captain declared he did not know what to do, and

thought if he left Mr. Williams behind, he would be blamed if there was any loss. The witness then went to the libelant and proposed to him that he should remain behind and take charge of the barge. This the libelant refused to do, saying that he did not want anything to do with it; for if he remained behind, he would only be cursed for his pains. The witness insisted, and after a good deal of conversation, the libelant said it was a very bad job, but that he did not see what else could be done. He remained and took charge of the barge upon the terms and conditions expressed in the following agreement, which was signed at the time:

"To all whom it may concern. Know ye that I, Daniel Collier, captain of the steamer Hungarian, having had the barge Jenny Lind loaded with flour, pork and tallow, and bound for New Orleans, in tow, and grounded said barge on Princeton bar in the Mississippi river, where she now lies in a perilous situation, do hereby abandon said barge Jenny Lind and cargo, to Joseph Williams, and agree that he shall have fifty per cent. upon all property saved. As witness my hand, dated at Princeton, Mississippi, this 10th day of February, 1853. (Signed) D. Collier, Captain of the Steamer Hungarian, for all concerned.

"We, the undersigned, hands employed on the above-named barge Jenny Lind, do also, so far as we are concerned or have any authority, abandon said barge to Joseph Williams, as above stated, believing it to be the best thing that Capt. D. Collier could do for all parties concerned. As witness our hands the day and date above written. (Signed) W. H. Mass. Hugh M. George."

The testimony of Mass is substantially corroborated by that of Robertson, who had been the second clerk of the Hungarian, but who also left her with the libelant, to aid in getting the barge afloat. The other persons who participated in the salvage service, were Thomas Sheehy, Daniel Burns, William and John Murphy, George Light and Joseph McKiver. They have already received a compensation for their services in the nature of wages, but are now claiming a further allowance in the nature of salvage, and allege in their intervening libels, that when they executed their receipts in full for wages, they did so in ignorance of their rights.

Before the libelant Williams and those who aided in the salvage service left the Hungarian, they received their wages then due, and were regularly discharged from the obligations of their contract by the captain. They left with his full consent, and were perfectly at liberty to embark in the enterprise. The salvors have been examined, to prove the character of the services they rendered, and the length of time they were engaged in getting the barge afloat. I have, however, attached very little importance to their testimony, not because there is any reason to believe that they have been guilty of exaggera-

tion in their statements of the value of their services, but because I find the disinterested testimony of Mass and of Robertson, to be sufficiently clear and satisfactory to enable me to arrive at a satisfactory conclusion. Both of these witnesses participated in the efforts which were finally successful in delivering the barge, but neither of them appears before the court as a salvor. The former, as we have already seen, was the supercargo of the barge, and seems to have exhibited throughout a becoming solicitude for the interests of the owners of the cargo. The latter was employed by the libelant at five dollars per day, and although not perhaps entirely disinterested, seems to have made his statement with great candor and with every appearance of truth. He is, moreover, in all material facts, sustained by the testimony of Mass.

This evidence fully establishes the meritorious character of the services rendered. The barge was regarded by Captain Collier of the Hungarian, to be in a perilous condition. Apprehensions were entertained that she would break in two. There was about ten feet of water at her bows as she lay on the bar, about three and a half or four feet at her stern, and about two feet a little abaft midships. She had already leaked a little and she was very much strained. The river was falling when the salvors commenced operations, though it rose about the time they got the barge afloat. The weather was very disagreeable as it was raining nearly all the time, and the men were greatly exposed. The libelant Williams was compelled to employ an additional force of twelve negroes from the neighboring plantation of Major Smith, and for each of these he agreed to give the sum of $5 per day. He lost two flat-boats while they were laden with a portion of the cargo of the barge. He paid $75 for one, and $153 for the other. He also paid $25 for the use of another. The salvors were laboriously engaged for three days in getting the barge afloat, and a great portion of this time they worked in the night, as the river was falling. When they finally succeeded in getting her off, a contract was made with the steamboat New Orleans to tow her to this port, and for this service $800 was agreed to be paid.

It is unnecessary to notice more particularly the evidence upon which the claim for salvage compensation is founded. The proctor for the claimants denies that any such claim can be legally asserted. But I cannot concur in the position he has assumed. Since the decision of the supreme court of the United States, in the case of The Genesee Chief v. Fitzhugh [12 How. (53 U. S.) 443], the admiralty jurisdiction has been clearly established upon the whole length and breadth of the Mississippi, and all other public rivers, as far as they are navigable from the ocean, for vessels of ten or more tons burden. The establishment of such a jurisdiction neces-

sarily carries with it all its incidents. Salvage services are as much the subject of admiralty jurisdiction, as damages arising from a collision or other maritime tort.

But while I am clear in the opinion, that I have no power to refuse to exercise a jurisdiction, which has been so fully and unequivocally conferred, and while I am satisfied from the evidence that the services performed by the salvors in this case, are of a highly meritorious character, I am yet constrained to differ very materially from the view taken by the captain of the Hungarian, in his estimate of the value of those services. Such contracts as the one which he thought proper to execute, in favor of the libelant (Williams), will be recognized no further in a court of admiralty charged with a case of salvage, than they accord with its own equitable discretion in filing the quantum of compensation. It would be absurd to call upon this court to enforce the specific performance of such contracts. They may, and often do, form a fair and equitable criterion in awarding compensation for salvage services, if those services have been rendered under circumstances which show that the parties have voluntarily, and without any controlling necessity, on the side of the proprietors of the property saved, or their agents, entered into a contract for a fixed compensation, or upon the ordinary terms of a compensation for labor and services quantum meruerunt; in either case it does not alter the nature of the service, but only fixes the rule by which the court is to be governed in awarding the compensation. It is still a salvage contract, and a salvage compensation. But contracts made for salvage services, are not held obligatory by a court of admiralty, upon the persons whose property is saved, unless the court can clearly see, that no advantage is taken of the situation of the parties, and that the rate of compensation is just and reasonable. The doctrine is founded upon principles of sound public policy, as well as upon just views of moral obligation. And it has been remarked with equal justice and elegance, that no system of jurisprudence. purporting to be founded upon moral or religious, or even rational principles. could tolerate for a moment the doctrine, that a salvor might avail himself of the calamities of others, to force upon them a contract, unjust, oppressive and exorbitant: that he might turn the price of safety to the price of ruin: that he might turn an act, demanded by Christian and public duty, into a traffic of profit which would outrage human feelings, and disgrace human justice. The Emulous [Case No. 4,480].

The terms of the contract in this case are entirely too exorbitant and do great injustice to the innocent owners of the barge and her cargo. If the services of the salvors had been rendered upon the ocean or on a dangerous coast. amid the perils arising from exposure to storms. I would not feel myself called upon to fix the quantum of compensation. at a

higher rate than was allowed by this contract. The actual labor performed was doubtless great, but it was entirely unattended with any danger to life, that most important ingredient in a salvage service. I have no disposition certainly to pass censure upon the conduct of the captain of the Hungarian; but as cases of this nature may frequently arise from the growing commerce of the Mississippi, I deem it my duty to lay down such rules for the future guidance of the court. as will teach the masters of steamboats that they cannot with impunity trifle with the rights of owners who confide property to their charge. In no sense of the maritime law was this a case of derelict, however the term "abandon" may have been used by Capt. Collier in his contract with the libelant. Parties cannot, by the terms they choose to employ, change the well established principles of law. This question of what constitutes a derelict in the sense of the maritime law, has already been examined by this court in various cases, and very recently in the case of The T. P. Leathers [Case No. 9,736]. The proceeds of the cargo in this case amount to $21.593.55, and the agreed value of the bark $3,600. making in the aggregate the sum of $25.193.55. Instead of the moiety allowed by the contract I am of opinion that one-sixth will be both a fair and liberal allowance. Of this amount I shall order the sum of $12 to be paid to each of the intervening libelants in addition to the sum they 'have already received as wages. The entire balance I shall order to be paid to the libelant Williams, in view not only of the services he has rendered, and the responsibility he assumed, but also of the expenses he incurred in saving the property.

The question of costs is reserved for future consideration, and in the meantime all parties having claims for costs under the provisions of the late act of congress, are ordered to present those claims to be filed with the clerk.